IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DENNIS R. MARSHALL,<br><br>    Plaintiff,<br><br><br>        vs.<br><br><br>JO ANNE B. BARNHART, Commissioner of Social Security,<br><br>    Defendant. | ORDER AFFIRMING ALJ'S DECISION DENYING DISABILITY INSURANCE<br><br><br><br>Case No. 2:06-CV-478 |

Before the court is Dennis R. Marshall's appeal from the Administrative Law Judge's decision denying him disability insurance benefits.  Mr. Marshall argues that this court should reverse and remand the ALJ's decision for two primary reasons: (1) the ALJ failed to properly evaluate the lay witness statements; and (2) the ALJ failed to evaluate the treating physician opinions using the required factors.  The government contends that not only was the ALJ under no obligation to state its reasons for disregarding lay witness testimony, but the ALJ in this case clearly and succinctly summarized the statements of lay witnesses and provided ample reasons why she found that the statements were not fully persuasive.  With respect to the ALJ's evaluation of the treating physician opinions, the government contends that the ALJ thoroughly analyzed these opinions and properly discounted them because they were rendered years after Mr.

Marshall's insurance expired.  The court agrees with the government.

The ALJ fully considered the lay witness statements of Mr. Marshall's wife and daughter. In addition to summarizing the statements, the ALJ devoted significant ink to the reasons why she was not persuaded by the statements.  The ALJ applied correct legal standards when she considered the treating physician opinions and appropriately discounted many of them because of the significant amount of time between the expiration of Mr. Marshall's insured status and the dates of the reports.  The ALJ's written decision demonstrates that the ALJ evaluated these and all opinions using the required factors.  Having thoroughly reviewed the record, the court finds that the ALJ applied the correct legal standards and that the factual findings are supported by substantial evidence in the record.  Accordingly, the court AFFIRMS the ALJ's decision to deny Mr. Marshall disability insurance benefits.

## PROCEDURAL BACKGROUND

On October 20, 1997, Dennis Marshall filed an application for disability insurance benefits.  This initial claim was denied on January 7, 1998, and was denied upon reconsideration a few months later.  At the request of Mr. Marshall, Administrative Law Judge Robert G. Holt conducted a hearing on the issue on October 16, 1998.  Judge Holt found Mr. Marshall not disabled on May 25, 1999.  The Appeals Council remanded the case, directing the ALJ to: obtain updated evidence; further evaluate Mr. Marshall's subjective complaints; give further consideration to Mr. Marshall's maximum residual functional capacity during the entire period at issue; provide further rationale as to Mr. Marshall's residual functional capacity to meet the demands of his past relevant work; and obtain evidence from a vocational expert.

Administrative Law Judge Gilbert A. Martinez held a second hearing on August 27,

2002, to address the remand from the Appeals Council.  Judge Martinez denied benefits on

November 1, 2002.  Once again, the Appeals Council remanded the case because the ALJ failed

to properly follow its instructions.

ALJ Kathleen H. Switzer found Mr. Marshall not disabled in a decision dated April 22,

2004.  The Appeals Council remanded the case for a third time on March 3, 2005.  The Appeals

Council once again noted that the ALJ failed to follow its instructions.  Specifically, the remand

order directs the ALJ to discuss and evaluate all lay witness testimony, giving reasons germane

for discounting the testimony should she not be persuaded by the testimony.  Furthermore, the

Appeals Council directed the ALJ to make findings of fact with respect to the exertional and non-

exertional requirements of any work found to be past relevant and to compare the assessed

residual functional capacity with Mr. Marshall's past work to determine whether he could

perform it as previously performed or as generally performed in the national economy.

ALJ Switzer held a hearing on June 15, 2005, to address the remand.  She issued yet

another order denying benefits on July 27, 2005.  The Appeals Council denied Mr. Marshall's

request for review on May 11, 2006.

The May 2006 denial was the final administrative decision, making ALJ Switzer's June

2005 order the "final decision" for purposes of this appeal.  Pursuant to 42 U.S.C. § 405(g), Mr.

Marshall appeals to this court the June 2005 decision denying him benefits.

## STATEMENT OF FACTS

On September 27, 1997, Mr. Marshall signed his application for disability insurance

benefits in which he states that he became unable to work on October 22, 1992.  Mr. Marshall

listed his disabling injuries as a left knee joint replacement, shoulder injuries that required

multiple surgeries, and bone spurs and disc disease in his neck.  Mr. Marshall alleged that these injuries prevented him from working because he was unable to stand, sit, or walk for very long, could not lift heavy objects, and was unable to pass physical exams for work.

Mr. Marshall later amended the date he contends he became disabled to October 20, 1996.  Because Mr. Marshall's insured status expired on December 31, 1997, the relevant time period in this case is approximately fourteen months – October 20, 1996 through December 31, 1997.

*Prior work experience*

From 1984 to 1992, Mr. Marshall worked as a central supply technician and O.R. technician at Castleview hospital, working approximately thirty hours a week.  He worked in phone sales from August to September 1996 for Feature Films for Families.  Mr. Marshall has also worked as the owner of a ceramics shop, working approximately fifteen hours per week for much of the early Nineties and for a few months in 1997.

*Knee Injury*

Mr. Marshall experienced knee problems for many years, finally undergoing a total knee arthroplasty, performed by Dr. David Heiner, on October 21, 1992.  Mr. Marshall continued to experience pain in his knee following this surgery.  Two weeks after the surgery, Dr. Heiner noted that the x-rays showed "excellent prosthesis positioning" and that he looked great and just needed "to work harder on his range of motion which he [would] do."[1]  Dr. Heiner spoke with Mr. Marshall on the telephone a week later and reported that Mr. Marshall was making improvements on flexion and extension on his own. Reporting on Mr. Marshall's visit on

---

[1] R. 236.

December 1, 1992, Dr. Heiner indicated the Mr. Marshall's knee stability was excellent.  Dr. Heiner renewed his pain medication but encouraged him to decrease his usage.

On December 15, 1992, Dr. Heiner noted that Mr. Marshall looked good and that there was no need to continue with x-rays on a monthly basis.  Dr. Heiner reported that Mr. Marshall was full weight-bearing on that date.

After falling on the ice a few times in late 1992 and early 1993, Mr. Marshall presented to Dr. Heiner with foot problems on January 5, 1993.  Dr. Heiner suspected a possible fracture in the foot and ordered x-rays that did not show any obvious fractures.  With respect to Mr. Marshall's knee, Dr. Heiner noted that the x-rays "still look[ed] wonderful."[2]

When Mr. Marshall visited Dr. Heiner on January 26, 1993, Mr. Marshall described pain in his foot as a nine out of ten.  Dr. Heiner thought, on the whole, that Mr. Marshall was doing fair to good.  Dr. Heiner, however, "thought [Mr. Marshall's] complaints about pain [would] chronically be there because [he] thought [Mr. Marshall had] a tendency toward narcotic need."[3]  Dr. Heiner noted that he was not comfortable prescribing narcotics to Mr. Marshall anymore.

On January 6, 1996, Mr. Marshall visited the Castleview emergency room after twisting his left knee stepping in an open heating vent.  X-rays were negative and the treating doctor instructed Mr. Marshall to wear his knee brace, take Tylenol, ice and elevate alternating with heat, and see a doctor if he was not better in a few days.  On January 29, 1996, Dr. Heiner noted that Mr. Marshall's knee looked fine.  Dr. Heiner reported that Mr. Marshall's knee had excellent range of motion without limitation; slight medial grad I laxity; and excellent patella tracking.

---

[2] R. 231.

[3] R. 230.

Mr. Marshall presented with a new injury on October 1, 1996, complaining of ankle and knee pain after falling down stairs.  The x-rays were negative.  Dr. Heiner instructed Mr. Marshall to wear a leg brace and prescribed medication.  Dr. Heiner prescribed more medication about three weeks later when Mr. Marshall continued to complain of pain.  During a November 22, 1996 check-up, Dr. Heiner noted that Mr. Marshall's left knee had normal stability, range of motion, and patella tracking.  Mr. Marshall was still experiencing irritation and Dr. Heiner recommended that he wear his brace for another six weeks.  Dr. Heiner reported that Mr. Marshall's ankle injury had appeared to heal.  Dr. Heiner requested to re-evaluate Mr. Marshall in about ten weeks.

On February 4, 1997, Mr. Marshall returned to Dr. Heiner and reported that his knee was improving and that he felt less pain and discomfort.  X-rays of his knee still looked quite good and tests of his knee showed full range of motion without limitation.  Dr. Heiner reported that Mr. Marshall's medial collateral ligament appeared to have a grade I laxity, but his lateral collateral was fine and his anterior posterior cruciate was fine.  Dr. Heiner renewed medication.

On March 13, 1998, Mr. Marshall presented to Dr. Heiner with complaints of left knee pain.  Dr. Heiner reported that his "knee exam is benign with excellent range of motion, stability, function."[4] Dr Heiner reported that Mr. Marshall's knee had no signs of redness or inflammation, no signs of infection, and no localized tenderness.  X-rays of the knee were described by Dr. Heiner as looking excellent.

*Shoulder, Elbow, and Wrist Injuries*

In February 1994, Dr. Heiner diagnosed Mr. Marshall with "shoulder impingement

---

[4] R. 367.

syndrome with degenerative arthritis of the AC joint."[5]  Mr. Marshall underwent surgery for this problem on February 23, 1994.

Dr. Heiner performed bilateral carpal tunnel release surgery on Mr. Marshall on February 1, 1995.  Mr. Marshall returned to Castleview on March 26, 1995, complaining of left shoulder pain.  Dr. Heiner performed arthroscopic surgery on Mr. Marshall's left shoulder on April 19, 1995.  Mr. Marshall returned to Castleview on May 29, 1995, complaining of shoulder pain.  The doctor directed Mr. Marshall to apply ice and take ibuprofen.  Dr. Heiner performed a second arthroscopic surgery on Mr. Marshall's left shoulder on September 27, 1995.  Mr. Marshall had post-operative swelling and complained of left arm and elbow pain one week later.  On November 7, 1995, Dr. Heiner noted that Mr. Marshall's shoulder had good range of motion and that he looked good.  He wished to see Mr. Marshall back in his office in three months.

On January 29, 1996, Dr. Heiner found that Mr. Marshall had excellent range of motion of the shoulder with full internal and external rotation extension.  His rotator cuff strength was reported as excellent.

Dr. Heiner saw Mr. Marshall again on September 25, 1996, and noted that Mr. Marshall "couldn't be happier."[6]  At this meeting, Mr. Marshall indicated that he was doing overhead work with both shoulders, and he described no pain, discomforts, or limitations.  He rated his left shoulder as being 90% fully functional and his right shoulder 95%.

On September 9, 1997, Mr. Marshall was diagnosed with medial and lateral epicondylitis of the left elbow.  He received an injection and was provided with a prescription for pain

---

[5] R. 272.

[6] R. 333.

medication.  Mr. Marshall received an injection on his right elbow on September 23, 1997, after he injured it doing a lot of lifting.  Dr. Heiner noted that his left elbow seemed to be somewhat improved.  Dr. Heiner renewed his pain medications.

On October 14, 1997, Mr. Marshall returned to Dr. Heiner, complaining of right shoulder pain.  Dr. Heiner noted that Mr. Marshall had been doing a lot of lifting at his work, and diagnosed his injury as likely being "medial scapular irritation, possibly bursitis."[7]  Dr. Heiner found that Mr. Marshall had tenderness in the shoulder, but that he did have good motion of the "shoulder actively to flexion, extension, abduction, internal and external rotation."[8]  Mr. Marshall received an injection in his shoulder and had his pain medications prescription renewed.  On December 9, 1997, Mr. Marshall received another injection in his left elbow after complaining of carpal tunnel syndrome and tennis elbow.

Dr. Heiner performed carpal tunnel release surgery on Mr. Marshall's left arm on January 19, 1998.  A little over one week later, Mr. Marshall had release surgery for his "tennis elbow." At his check-up on February 24, 1998, Mr. Marshall was noted as having 75% normal range of motion in his left elbow, wrist, and hand.  At Mr. Marshall's visit to Dr. Heiner on April 7, 1998, Dr. Heiner noted that Mr. Marshall demonstrated normal range of motion in his elbow, and that his sensation, motor, circulatory function to the extremity looked good.  Dr. Heiner encouraged further exercise and rehabilitation.  Mr. Marshall returned to Dr. Heiner three weeks later complaining of neck and elbow pain suffered after working out with weights.  Dr. Heiner renewed Mr. Marshall's medications.

---

[7] R. 342.

[8] *Id.*

On July 17, 1998, Mr. Marshall presented to the Price Medical Clinic, complaining of pain in his right elbow suffered after lifting and twisting.  He was prescribed medication.  On September 17, 1998, he returned to the Price Medical Clinic complaining of the same injury and was provided with pain medication.  Five days later he returned to the Clinic and complained that there was no change in his condition.  He was once again prescribed more pain medication.

 On October 15, 1998, Mr. Marshall presented to Dr. Heiner, complaining of numbness, tingling, and aching in the arm.  Dr. Heiner diagnosed Mr. Marshall with medial epicondylitis, peripheral ulnar neuropathy, and mild lateral epicondilytis on the right elbow.  X-rays were normal.

*Neck and Back Injuries*

On March 22, 1993, Mr. Marshall visited the emergency room at Castleview Hospital because of back pain he started experiencing after working on a sink.  Dr. Cameron Williams diagnosed Mr. Marshall as suffering from "acute lumbar strain/spasm."[9]  Mr. Marshall was provided medication and ordered to use an ice pack on his back.

On April 23, 1994, Mr. Marshall visited the Castleview Hospital emergency room after experiencing two hours of pain in his right back area.  Dr. Williams assessed Mr. Marshall as having "pleurodynia and/or chest wall muscle spasm and pain."[10]  He was discharged with a prescription for pain medication and anti-inflammatory drugs and was directed to follow-up with his attending physician.

In April 1997, Mr. Marshall began experiencing neck and shoulder pain after he filled and

---

[9] R. 266.

[10] R. 271.

stacked sandbags to protect his home.  Two days after stacking the sandbags, Mr. Marshall presented to the Castleview Hospital emergency room.  He was provided with medication and directed to wear an arm sling and to use a heating pad.

On June 3, 1997, Mr. Marshall returned to Castleview complaining of neck pain suffered after shoveling.  Dr. Arvid Carlson diagnosed Mr. Marshall with chronic neck pain and provided him with pain medication.  On June 26, 1997, Mr. Marshall had x-rays taken of his neck and back.  The June 26 x-rays were compared to x-rays from Dr. Heiner's office dated April 15, 1997.  The bony alignment and marrow signal appeared normal.  The C1-2, C2-3, C4-5, C5-6 appeared normal.  The report states that there were a small dorsal osteophytes and subchondral sclerosis at C3-4, as well as uncinate process spurs and mild bilateral neural foraminal narrowing.  At C6-7, x-rays revealed small marginal osteophytes and a probable annular disk tear dorsally.  There was no convincing evidence of herniated nucleus pulposus or nerve root impingement at C6-7.

On October 12, 1997, Mr. Marshall presented to the Castleview hospital with complaints of back pain.  The diagnosis reads: "Right scapular muscular strain."[11]  Mr. Marshall was provided with OxyContin and Soma, encouraged to drink fluids, instructed to ice and heat his back, and was directed to avoid lifting, bending, or twisting.  He was instructed to see his doctor if he was not feeling better in one week.

*Other Examinations*

On February 9, 2004, Dr. Shane Gagon completed a "Fibromyalgia Residual Functional Capacity Questionnaire" regarding Mr. Marshall.  Dr. Gagon reported that he had been treating

---

[11] R. 335.

Mr. Marshall since January 2001.  He gave Mr. Marshall a prognosis of "fair."  He reported that

Mr. Marshall could continuously sit for ten minutes; could continuously stand for ten minutes;

could sit less than two hours in an eight-hour workday; could stand/walk less than two hours in

an eight-hour workday; and must walk every twenty minutes for about five minutes.

On March 6, 2004, Dr. Trey O'Neal completed a "Medical Source Statement of Ability to

do Work-Related Activities (Physical)" regarding Mr. Marshall.  Dr. O'Neal concluded that Mr.

Marshall could occasionally lift ten pounds; could frequently lift only less than ten pounds; could

stand and/or walk less than two hours in an eight-hour workday; could sit less than about six

hours in an eight-hour workday; must periodically alternate sitting and standing; was limited in

lower extremities; could never climb, kneel, crouch, crawl, or stoop but could occasionally

balance; and, was limited in reaching in all directions but unlimited in handling, fingering, and

feeling.

Also on March 6, 2004, Dr. Gagon completed a report on behalf of Mr. Marshall in which

he described his history of back problems, knee problems, shoulder problems, and hand

problems.  Dr. Gagon concluded that Mr. Marshall's left knee pain created significant

functioning limitations that may require surgical intervention.  Dr. Gagon also found that he had

lumbar back pain that would make it difficult to engage in any activities requiring prolonged

sitting.  With regard to Mr. Marshall's shoulders, Dr. Gagon found that Mr. Marshall could

occasionally lift ten pounds with his right arm and occasionally lift twenty pounds with his left

arm.  Dr. Gagon did not find Mr. Marshall's complaints of carpal tunnel syndrome to be a

functioning limiting issue.

On May 24, 2004, Dr. Gagon completed a "Residual Functional Capacity Questionnaire,"

in which he concluded that Mr. Marshall could sit for ten minutes at a time; stand for ten minutes at a time; would need to sit in a recliner or lie down for two hours each day; could sit less than two hours in an eight-hour workday; and, could stand less than two hours in an eight-hour workday.

On June 7, 2005, Dr. Heiner completed a "Residual Functional Capacity Questionnaire" for Mr. Marshall.  He reported that Mr. Marshall could sit for fifteen to twenty minutes at a time; could stand/walk for fifteen to twenty minutes at a time; could sit two hours in an eight-hour workday; could stand/walk for two hours in an eight-hour workday; could occasionally lift less than ten pounds but could never lift more; and would likely be absent from work more than four times a month.  Also on June 7, 2005, Dr. Heiner completed a "Major Dysfunction of Joints" worksheet in which he indicated that Mr. Marshall had gross anatomical deformity, chronic joint pain and stiffness, limitation of motion, inability to ambulate, and inability to perform fine and gross movements effectively.

*State Agency Physician*

On December 26, 1997, a physician working for the state of Utah reviewed the medical evidence of Mr. Marshall then on file.  He completed a "Residual Functional Capacity Assessment" form, concluding that Mr. Marshall could occasionally lift and/or carry twenty pounds and could frequently lift ten pounds; stand and/or walk about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and was unlimited, other than as identified for lift and/or carry, in his ability to use his hands and feet to push and/or pull.

*Mr. Marshall's Testimony*

On August 27, 2002, at his second hearing, Mr. Marshall indicated his desire to amend

his alleged onset date to October 20, 1996.  Mr. Marshall's representative interjected to note that

the date on which Mr. Marshall was last insured was December 31, 1997.  Mr. Marshall's

representative also recognized that Mr. Marshall had to prove that he was disabled prior to

December 31, 2007.

Mr. Marshall testified that he had around sixteen surgeries on his left knee and three

surgeries on his right knee.  He described his neck, shoulder, and back pain.  He noted that he did

not sleep well at nights and seldom left the house.  He stated that he started his own ceramics

business but stopped doing that, testifying that he could no longer lift the molds.

At the June 15, 2005 hearing, Mr. Marshall responded to the ALJ's question about his

condition since 1992, stating that it had become continually worse.  Mr. Marshall again noted

that he started a ceramics business after trying hard to find a job.

*Vocational Expert Testimony*

Dr. Orlando Rivera testified at Mr. Marshall's second administrative hearing on August

27, 2002.  Dr. Rivera identified Mr. Marshall's prior jobs and described the skill level and

exertion level for each job as follows: surgical supply technician – light exertion and semi-

skilled; ceramics shop owner – heavy exertion; and phone sales – sedentary exertion and semi-

skilled.  The ALJ posed a hypothetical question to Dr. Rivera based on a forty-seven-year-old

individual who had a high school diploma and two years of college; had a total left knee

replacement, right shoulder surgery, left shoulder surgery, and right knee surgeries; could sit for

one to two hours at a time; could stand continuously for thirty minutes or less at a time; who

would need a sit-stand option; could lift fifteen pounds occasionally and ten pounds or less

frequently; could walk occasionally; could reach overhead occasionally; could occasionally push

and pull; could turn arms and wrists; could frequently open and close fist; could use hands and fingers frequently; who had normal grip strength and hand dexterity; and was mildly limited in the ability to concentrate.  Based on this hypothetical individual, Dr. Rivera concluded that such a person could not perform heavy, medium, or light work, but could perform sedentary work and could perform the job of phone sales.  When the ALJ changed the hypothetical to say that the individual could only sit four of eight hours, Dr. Rivera concluded that such an individual could not perform any job.

Mr. Marshall's representative asked Dr. Rivera to comment on whether an individual under the first hypothetical, who, in addition to the limitations already provided, was also limited to laying down at least two hours in an eight-hour work day, would be able to perform the job of phone sales.  Dr. Rivera responded that such an individual could not perform such a job.

At Mr. Marshall's third administrative hearing on June 15, 2005, Jack Hurst testified as a vocational expert.  Mr. Hurst classified Mr. Marshall's prior jobs as follows: central supply worker – light exertion level and semi-skilled; operating room technician – light and skilled; production worker ceramics – semi-skilled and light according to dictionary definition but medium to heavy based on Mr. Marshall's testimony; telemarketer – sedentary and semi-skilled. The ALJ posed a hypothetical to Mr. Hurst based on an individual who could stand for two hours in an eight-hour work day; could sit for at least six hours out of an eight-hour work day; could occasionally lift up to fifteen pounds and could frequently lift ten pounds or less; could not climb stairs or squat; could occasionally bend, stoop, reach above the shoulder, push, pull, and use foot pedals, and needed a sit-stand option.  Based on this hypothetical, the ALJ asked whether such an individual could perform any of Mr. Marshall's prior work positions.  Mr. Hurst testified that,

with respect to Mr. Marshall's former employment positions, the hypothetical individual could perform only the position of telemarketer.  When asked if there were any other jobs within the national economy that such an individual could perform, Mr. Hurst responded that there would be jobs the individual could perform, such as touch-up screener in the printed circuit board industry, semi-conductor bonder, and surveillance systems monitor.

*The ALJ Decision*

On July 27, 2005, ALJ Kathleen Switzer issued her decision stating that Mr. Marshall was not entitled to a period of disability or disability insurance benefits.  She found that Mr. Marshall met the non-disability requirements for a period of disability and disability insurance benefits and that he was last insured on December 31, 1997.  Although the ALJ found as "severe" Mr. Marshall's impairments from his left total knee prosthesis, status post rotator cuff repair-bilaterally, ankylosis shoulders - bilaterally, cervical ankylosis - slight, and left epicondylitis and carpal tunnel syndrome, the ALJ found that these impairments "did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4."[12] The ALJ found that Mr. Marshall was unable to perform any of his past relevant work but "had the residual functional capacity to perform a significant range of sedentary and light work."[13]

## STANDARD OF REVIEW

The court reviews Mr. Marshall's appeal of the ALJ's decision "to determine if the factual findings are supported by substantial evidence in the record and whether correct legal

---

[12] R. 37.

[13] *Id.*

standards were applied."[14]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[15]  The court "may neither re-weigh the evidence nor substitute [its] discretion for that of the [ALJ]."[16]  Where evidence as a whole can support either the agency's decision or an award of benefits, the agency's decision must be affirmed.[17]  Nonetheless, the court is to "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."[18]

## DISCUSSION

Mr. Marshall argues that this court should reverse and remand the ALJ's decision for two primary reasons: (1) the ALJ failed to properly evaluate the lay witness statements; and (2) the ALJ failed to evaluate the treating physician opinions using the required factors.  The government contends the ALJ in this case clearly and succinctly summarized the statements of lay witnesses, and concluded that she did not find them persuasive.  The government also contends that the ALJ properly discounted those treating physician opinions that occurred years after Mr. Marshall's insurance expired.  The court finds that the ALJ properly evaluated the statements of Mr. Marshall's wife and daughter, providing a detailed explanation as to why the ALJ did not find the lay witness testimony persuasive.  The court also finds that the ALJ applied

---

[14] *Doyal v. Barnhart*, 331 F.2d 758, 760 (10th Cir. 2003).

[15] *Id.*  (citations and internal quotation marks omitted).

[16] *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2002).

[17] *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).

[18]  *Grogan v. Barnhart*, 39 F.3d 1257, 1261 (10th Cir. 2005).

correct legal standards when she properly discounted treating physician opinions that occurred

years after the period in question.  The ALJ applied correct legal standards and the ALJ's factual

findings are supported by substantial evidence in the record.

### A.  Evaluation of Lay Witnesses

Section 404.1513 of the Code of Federal Regulations outlines the various sources who

can provide evidence to establish an impairment in a claim for social security disability benefits.

In addition to evidence provided by licensed medical care providers, the ALJ "*may* also use

evidence from other sources to show severity of [impairments]," such as statements from

spouses, relatives, and friends.[19]  The Tenth Circuit has noted that an ALJ need not "make

specific written findings of each witness's credibility, particularly where the written decision

reflects that the ALJ considered the testimony."[20]  The Appeals Council, however, specifically

instructed the ALJ to discuss and evaluate all lay witness testimony, giving reasons germane for

discounting the testimony should she not be persuaded by the testimony.[21]  The court finds it

noteworthy that the Appeals Council declined Mr. Marshall's request for review, suggesting that

the ALJ adequately addressed this issue.  Nevertheless, the court has thoroughly reviewed this

issue and finds that the ALJ fully complied with the Appeals Council's direction regarding lay

witness testimony.

The ALJ properly evaluated the statements of lay witnesses and fully articulated why she

did not find the statements to be persuasive.  In her report, the ALJ stated that she "evaluated

---

[19] 20 C.F.R. § 404.1513(d).

[20] *Adams v. Chater*, 93 F.3d 712, 715 (10th Cir. 1996).

[21] R. 507.

statements ostensibly submitted from [Mr. Marshall's] spouse."[22]  The ALJ proceeded to

summarize the spouse's statement.  The ALJ then turned her attention to statements from Mr.

Marshall's daughter, summarizing her statements, and then concluding that she did not find the

testimony and reports from Mr. Marshall and his family to be fully persuasive.  The ALJ noted

that Mr. Marshall

> reported he was able to perform part-time work activity during the relevant time
> period which was quite strenuous.  For example, he was lifting up to 100 pounds
> 'often' in his ceramic business, just before he applied for benefits.  This level of
> activity is consistent with a finding that the claimant could have performed less
> strenuous work on a full-time basis.[23]

The ALJ proceeded to devote three more full paragraphs to explaining why she did not find the

lay witness testimony persuasive.

    The court finds that the ALJ considered the lay witness testimony, and thoroughly

addressed the reasons, through specific examples in the doctors reports and Mr. Marshall's own

testimony, as to why she was not persuaded by the statements.

### B.  Treating Physician Opinions

    Mr. Marshall contends that the ALJ failed to properly evaluate the treating physician

opinions that arguably supported disability.  Specifically, Mr. Marshall argues that the ALJ failed

to follow the required process and explain what weight was given to the testimony and the

reasons for giving that weight.  Mr Marshall contends that the ALJ's single stated reason for

discounting the opinions - that they were rendered after the date Mr. Marshall was last insured –

---

[22] R. 32. (The ALJ noted that the statements appeared to be in the daughter's
handwriting.).

[23] R. 32.

is inadequate and requires reversal.  The government counters that the significant amount of time between December 1997 and the creation of these records warranted a discount in light of the dearth of evidence of actual disability during the actual period in question.  The government also finds support for its argument in the fact that the ALJ expressly noted some of the inconsistencies with these post-1997 reports and the substantial evidence in the rest of the record.  The court finds that the ALJ followed the required process and explain what weight was given to the testimony and the reasons for giving that weight.  The ALJ properly discounted these late reports, and where applicable, the ALJ explained how some of these later reports were inconsistent with other substantial evidence in the record.

An ALJ "must 'give good reasons in [the] notice of determination or decision' for the weight assigned to a treating physician's opinion."[24]  The ALJ's decision or notice of determination must be sufficiently specific to ensure that subsequent reviewers understand the weight an ALJ afforded treating physicians' opinions and the reasons for that weight.[25] Generally, ALJs should give more weight to opinions from treating sources.  However, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record."[26]

The ALJ should engage in a sequential analysis when addressing treating source opinions.

---

[24] *Watkins v. Barnhart*, 350 F. 3d 1297, 1300 (10th Cir. 2003) (quoting C.F.R. § 404.1527(d)(2)).

[25] *Id.*

[26] *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *2) (internal quotations omitted)

First, the ALJ must consider whether the "opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'"[27]  If the opinion is not well-supported, then the inquiry is done at this stage.  If the opinion is well-supported, the ALJ must then confirm that the opinion is consistent with other substantial evidence in the record.[28]

Even if an ALJ determines that a treating source should not be given "controlling weight," such treating source opinions are nevertheless entitled to deference.[29]  Treating source opinions should be weighed using the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.[30]

The ALJ applied the correct legal standards when she discounted physician opinions that were rendered years after Mr. Marshall's insured status lapsed.  The ALJ explained what weight she was affording the opinions, and explained why she afforded such weight to the reports.  Once again, the relevant time period for disability in this case is October 1996 through December 1997.  The court finds that the ALJ's discounting of reports made after the year 2000 was appropriate in light of the significant time between the reports and the time-period in question.  Moreover, some of these later reports were inconsistent with reports made during the relevant

---

[27] *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *2).

[28] *Id.*

[29] *Id.*

[30] *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001); *see* 20 C.F.R. § 404.1527; 20 C.F.R. § 416.927.

time period.  The court will address these medical source statements in turn.

### 1. Trey O'Neal

The ALJ first addressed the medical source statements of Dr. Trey O'Neal.  Dr. O'Neal had stated that Mr. Marshall could occasionally lift only 10 pounds, could stand less than two-hours, and sit less than two hours in an eight-hour workday.  Furthermore, Dr. O'Neal opined that Mr. Marshall could never kneel, climb, crouch, crawl, or stoop.  The ALJ stated that she did not give much weight to the opinion because it was made on March 6, 2004 - "many years after [Mr. Marshall's] insured status had lapsed."[31]   The 2004 report was more than six years after the period in question, October 1996 through December 1997.  The ALJ also found that the report was not pertinent to the issue at hand.  The court does not completely agree with the ALJ that the report is not pertinent; however, the court agrees that the long time between the reports and period in question is a significant factor that warrants discounting of the report.

### 2. Dr. Shane Gagon

The ALJ then addressed various reports from Dr. Shane Gagon.  The ALJ specifically cited the reports dated August 8, 2002, February 9, 2004, and May 24, 2004. The 2002 report notes that Mr. Marshall could sit, stand, or walk less than two hours in an eight-hour work day and that he could only occasionally lift five pounds.  In his February 2004 report, Dr. Gagon opined that Mr. Marshall was incapable of low stress jobs, and that he could sit or stand less than two hours in an eight-hour work day.  In the May 2004 report, Dr. Gagon opined that Mr. Marshall would need to lie down for two hours in an eight-hour period and his impairments would result in him being absent from work four-plus times a month.

---

[31] R. 33-34.

Although Dr. Gagon was Mr. Marshall's treating physician, he did not start treating Mr. Marshall until January 2001, more than three years after the period in question. Accordingly, the ALJ did not give the reports controlling weight. And given the "great amount of time between when he began treatment of the claimant and the date the claimant was last insured for benefits," the ALJ found that Dr. Gagon's report was not persuasive.[32] The court finds that the ALJ applied correct legal principles when addressing the reports of Dr. Gagon.

### 3. Dr. David Heiner

Dr. Heiner was another treating source of Mr. Marshall. On June 7, 2005, Dr. Heiner produced a report in which he indicated that Mr. Marshall could sit for fifteen to twenty minutes at a time, could stand and/or walk fifteen to twenty minutes at a time; could sit for two hours in an eight-hour work day; could stand or walk for two hours in an eight-hour work day; and that he could occasionally lift ten pounds or less.[33] In addition to discounting the report based on the seven-plus years between the period in question and this report, the ALJ found Dr. Heiner's opinion to be inconsistent with his own records. This court agrees.

Dr. Heiner, in a report dated September 25, 1996, stated that Mr. Marshall was "doing well," and that Mr. Marshall "couldn't be happier."[34] Dr. Heiner also reported that Mr. Marshall had "full range of motion, actively and passively without limitation."[35] In November 1996, Dr. Heiner reported that the stability, range of motion, and patella tracking was all normal on Mr.

---

[32] R. 34.

[33] R. 697-98.

[34] R. 333.

[35] *Id.*

Marshall's knee.[36]  Dr. Heiner reported in February 1997, that x-rays of Mr. Marshall's knee looked quite good, with no signs of osteolysis or signs of loosening."[37]  And in April 1997, Dr. Heiner noted that Mr. Marshall only had "mild disc disease of the cervical spine."[38]  (The court finds it noteworthy that Mr. Marshall's April 1997 visit was shortly after he and his sons filled 200 sand bags.)[39]

After recounting much of this evidence in her report, the ALJ found that "Dr. Heiner's own notes [did] not support the determination that [Mr. Marshall] became disabled prior to the date he last became insured for disability insurance benefits."[40]  Once again, the ALJ applied the correct legal standards and properly discounted Dr. Heiner's 2005 report because it was made years afer the period in question and it contradicted his earlier reports.

The court finds that the ALJ evaluated the treating physician opinions using the required factors.

### C. Substantial Evidence and Correct Legal Principles

Although the court has found no merit to Mr. Marshall's arguments regarding the ALJ's decision, the court will briefly continue its discussion on whether substantial evidence supports the ALJ's final decision.  A thorough review of the record reveals that the ALJ applied correct legal standards and her factual findings are supported by substantial evidence.

---

[36] R. 329.

[37] R. 350.

[38] R. 348.

[39] *Id.*

[40] R. 34.

*1. State Agency Physician*

An ALJ must consider the expert opinions of state agency physicians.[41]  On December 26, 1997, the state agency physician reviewed the medical evidence of record regarding Mr. Marshall and concluded that Mr. Marshall could occasionally lift twenty pounds; frequently lift ten pounds; could stand and/or walk for about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday.[42]  The physician noted that Mr. Marshall's ability to reach in all directions was limited.[43]  In summation, the state agency physician concluded that Mr. Marshall retained the residual functional capacity to perform work activities.[44]

The ALJ properly considered the report of the physician from the state agency.  In her report, the ALJ found that Mr. Marshall was more limited in his ability to sit, stand, lift or carry than the state agency found, but concurred in the finding that Mr. Marshall was limited in his ability to reach.[45]  The agency report supports the ALJ's determination that Mr. Marshall was not disabled during the period in question.

*2. The Vocational Expert*

It is appropriate for an ALJ to use as a basis for her disability decision a vocational expert's answer to a well-formulated hypothetical question that includes all the limitations of the

---

[41] 20 C.F.R. § 404.1513(c).

[42] R. 351-59.

[43] R. 354.

[44] *Id.*

[45] R. 35.

claimant.[46]  According to the vocational expert in this case, an individual with Mr. Marshall's

limitations could perform work as a surveillance systems monitor (approximately 125,000 jobs in

the national economy), a semi-conductor bonder (70,000 jobs), and a touch-up screener in the

printed circuit board industry (105,000 jobs).  In Finding 11 of the decision, the ALJ states that

Mr. Marshall had the functional capacity to perform a significant range of sedentary and light

work.[47]  The ALJ also relied on the vocational expert in Finding 12, where she lists the three jobs

described above that Mr. Marshall could have performed.[48]  The ALJ appropriately relied on the

vocational expert in this case.

  *3. Daily Activities*

  The substantial evidence in this case demonstrates that Mr. Marshall's condition during

the period October 20, 1996, through December 31, 1997, did not prevent him from engaging in

any substantial gainful activity.  In fact, the medical records paint a picture of a man who,

although limited, was quite active during the period in question.  An ALJ may consider a

claimant's daily activities when evaluating the credibility of a claim.[49]  The court finds that many

of Mr. Marshall's visits to the doctor – visits that Mr. Marshall points to as support for his

disability – were in fact necessitated by gainful and often quite strenuous activities.  For example,

Mr. Marshall's neck and back pain described in his April 1997 visit to the hospital occurred after

---

[46] *See Qualls v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000).

[47] Tr. 37.

[48] Tr. 38.

[49] *See Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

he and his sons stacked 200 sand bags.[50]  Mr. Marshall's June 1997 visit, where he complained of

neck pain, was after he had been shoveling.[51]  And his September and October 1997 visits, where

he complained of left elbow pain and right shoulder pain, respectively, were after he had been

doing a lot of lifting at his business.[52]  Mr. Marshall's work as a ceramics business owner during

1997 involved heavy exertion that was properly considered by the ALJ.  The ALJ's decision is

supported by the activities of Mr. Marshall during the time in question.

> *4. Doctor Reports*

Many of the doctors' reports themselves undercut Mr. Marshall's claim for disability.

Although Mr. Marshall often complained of significant pain and limitation during his doctor

visits, the reports often indicate relatively minor issues, if not positive results.  For example, in

October 1996, the disability onset month, Dr. Heiner's x-rays of Mr. Marshall were negative, and

the diagnoses of an ankle sprain, likely knee contusion, and likely medial collateral ligament

posterior medial capsular injury, resulted in only limited, conservative treatment.  Moreover, Dr.

Heiner's report in November 1996, six weeks into treatment on his left knee, states that

"[s]tability is normal, range of motion is normal, patella tracking is normal."[53]  In February 1997,

Dr. Heiner once again reported that Mr. Marshall's knee looked good, as his "range of motion

[was] full and complete without limitation."[54]  The court also notes that just a few weeks before

---

[50] R. 348.

[51] R. 339.

[52] R. 342; 343.

[53] R. 329.

[54] R. 350.

the disability onset date, Mr. Marshall reported to Dr. Heiner, on September 25, 1996, that he

"couldn't be happier" and that he felt "fully functional" and "capable of working."[55]  Dr. Heiner's

own diagnosis supports Mr. Marshall's statements, as he found that Mr. Marshall had full range

of motion with his shoulder.[56]  The court does not wish to minimize the pain that may have been

felt experienced by Mr. Marshall, but the aforementioned doctor's reports undercut his claim of

disability.

## CONCLUSION

The ALJ properly evaluated lay witness statements and applied correct legal standards

when she discounted many of the treating physician opinions.  The court also finds that the

factual findings are supported by substantial evidence in the record and the ALJ applied the

correct legal standards.  Accordingly, the court AFFIRMS the ALJ's decision to deny Mr.

Marshall disability insurance benefits.

DATED this 11th day of September, 2007.

BY THE COURT:

Paul G. Cassell
United States District Judge

---

[55] R. 333.

[56] *Id.*